**NATIONAL LABOR RELATIONS BOARD, Petitioner,**
**v.**
**IDAHO EGG PRODUCERS, Inc., Respondent.**
**No. 14700.**

United States Court of Appeals
Ninth Circuit.
Feb. 1, 1956.

Theophil C. Kamholz, General Counsel, David P. Findling, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Robert Tillman, Frederick U. Reel, John Francis Lawless, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

Eli A. Weston, J. L. Eberle, Richards, Haga & Eberle, Boise, Idaho, for appellee.

Before HEALY and POPE, Circuit Judges, and MATHES, District Judge.

PER CURIAM.

This matter is before us on petition of the NLRB for enforcement of its order issued against respondent in January of 1955. The petition is based on findings of violation of § 8(a) (1) and (5) of the Act, 29 U.S.C.A. § 158(a) (1, 5). Following is a summary of the examiner's findings of fact, all of which were unanimously adopted by the Board.

Respondent is engaged at several plants in the State of Idaho in the marketing of eggs and poultry. In September of 1953 a local of the Teamster's Union initiated a campaign to organize the workers at respondent's Pocatello plant. Three of the union-minded employees canvassed others of the workers at their homes. Although they were able to reach a number of them in this manner, as of September 22 a majority had not yet signed with the Union. On the evening of that day a union representative conducted a meeting to explain the Union's program and to obtain further signatures. The meeting was attended by 18 or 19 employees. With the additional cards secured during the meeting, a total of 18 out of respondent's 27 employees signed cards specifically designating the Union as their bargaining representative.

The following day the Union notified respondent's plant manager, Slayden, that a majority of the employees had signed union cards and requested that respondent recognize the Union as their bargaining agent. Slayden by letter refused to bargain on the ground that bargaining was not within the jurisdiction of his office. Thereupon, on September 24, the Union filed a petition with the Board seeking an election to determine its status as bargaining representative. Meanwhile, on September 23, Hoffman, one of the employees who had attended the union meeting, gave Slayden a full account of what had transpired at the meeting. On September 24 Slayden summoned employee Ruthe Jensen, who had been active in the organizational work, to come to his office and have a talk. On Jensen's arrival Slayden said he had heard from other sources that she was "one of the main ones in this Union," and that he had in his possession the names of all who had signed cards. He inquired of Jensen, "What have I

done wrong that you have gone and gotten the Union?" Jensen replied that the employees desired to have Saturdays made a holiday, and Slayden said that he thought this could be "worked out." As for other matters Slayden suggested that the employees could bargain with him, that he was open-minded on bargaining. Slayden warned that if the Union came into the plant the employees might lose their Christmas bonus. Also, he reminded Jensen that there were already plans in the plant for the installation of automatic egg candling machines and that respondent would go ahead with them if it became necessary. When Jensen returned to her work station she related Slayden's remarks to the other employees, and the employees "then and there" began to talk of withdrawing from the Union. Slayden interviewed also another of the employees who had been active in the membership drive, and repeated to her the warnings he had given Jensen.

On September 26 Slayden appeared in the egg candling room and stated to the women employees working there that all the Union could do for them was to cost them dues. He added that he had decided to grant the request for Saturdays off and repeated that respondent could install labor-saving machinery if that became necessary. In closing, he stated that he had never been a union man, and still hoped they "could work it out together without involving the Union." After Slayden left one of the employees remarked that they were "in Dutch" and that Slayden could "fire the whole crew and get a new bunch in." Within an hour Slayden received word that considerable sentiment existed among the employees in favor of withdrawing from the Union. He then visited the egg candling area a second time and informed the girls that they could leave at once for the union hall to withdraw their cards, and that they could use his car for the purpose and would be paid wages until the noon closing hour, which was still an hour off. A group of

them left immediately. Thereafter respondent eliminated Saturday work.

On October 1 the respondent agreed to a Board-conducted election among the employees. On October 29 the Union requested permission to withdraw its representation petition, and on November 2 the Board granted the permission. Shortly thereafter the present proceeding was initiated.

On the basis of the foregoing the examiner and the Board found that at the time of the Union's bargaining request it represented an uncoerced majority of respondent's employees in an appropriate unit, and that respondent refused to bargain—not because of a good-faith doubt of the Union's majority—but because of a desire to undermine the Union by committing unfair labor practices. Respondent was ordered to cease and desist from the practices, to bargain with the Union on request, and to post appropriate notices.

 While as is usually the situation in proceedings such as this there are conflicts in the testimony, the record as a whole amply supports the Board's findings. But respondent argues that because of the lapse of time the situation at its plant has undergone so material a change as to make it inequitable now to enforce the order to bargain without a representation election. Respondent has made no showing of a change in conditions. Moreover an employer may not set up as a justification for its refusal to bargain with a union the defection of union members which it had itself induced by unfair labor practices, even though the consequence is that the union no longer has the support of a majority. In such circumstances the employer will be required to bargain notwithstanding the union does not presently have a majority. N.L.R.B. v. Parma Water Lifter Co., 9 Cir., 211 F.2d 258. Where an employer is found on adequate evidence to have committed an unfair labor practice or practices, it is the function of the Board, rather than of the court, to determine what affirmative action on the em-

**824**

ployer's part will best serve to vindicate the policies of the Act. Section 10(c). Consult N.L.R.B. v. Warren Co., 350 U. S. 107, 76 S.Ct. 185.

A decree enforcing the Board's order will accordingly be entered.