440 F.2d 7
 WESTINGHOUSE ELECTRIC CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
International Union of Electrical, Radio and Machine Workers, AFL-CIO, Local 456, Intervenor.
 No. 332.
 No. 333.
 Docket 34917.
 Docket 35073.
 United States Court of Appeals, Second Circuit.
 Argued January 5, 1971.
 Decided March 30, 1971.
 
 Martin D. Heyert, New York City (Kelley, Drye, Warren, Clark, Carr & Ellis, Theodore R. Iserman, Frederick T. Shea and Eugene T. D'Ablemont, New York City, on the brief), for petitioner.
 Warren M. Davison, Deputy Asst. Gen. Counsel, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel and Daniel M. Katz, Atty., on the brief), for respondent.
 Robert Friedman, New York City (Irving Abramson and Ruth Weyand, Washington, D. C., on the brief), for intervenor.
 Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.
 LUMBARD, Chief Judge:
 
 
 1
 Westinghouse asks the Court to review and set aside an order of the Board requiring Westinghouse to bargain with the IUE as the collective bargaining representative of the Systems and Procedures Analysts at Westinghouse's Jersey City Works, and the N.L.R.B. cross appeals for enforcement of its bargaining order. 177 N.L.R.B. No. 49 (1969); 182 N.L.R.B. No. 85 (1970).
 
 
 2
 In 1950 the union was certified, and in 1956 it was recertified as the collective bargaining agent for "all office, clerical, and technical employees" at Westinghouse's Works at Jersey City and since 1950 the company and the union have entered into collective bargaining agreements covering these employees.
 
 
 3
 In 1956, shortly after the recertification of the bargaining unit, Westinghouse began an effort to convert its then-existing clerical procedures to systems which utilize IBM machines to perform clerical functions. During the late 1950's, the company expanded the mechanization process, acquired more equipment, and began hiring programmers to run the equipment. Computer equipment was first acquired in 1961; and in the same year the company issued a new job description for "Systems and Procedures Analysts A and B." There are presently seven Systems Analysts employed by the company in Jersey City, and their primary responsibility is to formulate procedures which will result in the satisfactory transfer of work to the new mechanized system.
 
 
 4
 The union first showed an interest in the Systems and Procedures analysts in 1965. On June 4 of that year Anton Handel, president of the union, in a letter to the company's industrial relations manager, Leonard Casner, requested information concerning a number of the company's employees who, for some reason, were outside of the scope of the bargaining unit. The company's answer on December 2, 1965 listed the names of the systems and procedures analysts and asserted that the reason they had not been included in the bargaining unit was that professional employees had been excluded from the certified unit by the specific language of the certification.
 
 
 5
 In 1967 the union filed a unit clarification petition with the Board in an attempt to include in the unit the company's Systems and Procedures Analysts "A" and "B." The Acting Regional Director conducted a hearing and on October 18, 1967 he issued his decision in which he ordered that the Systems and Procedures Analysts "A" and "B" be included in the unit. He found that they were not professional or confidential employees; that they were technical employees who had a community of interest with employees already in the unit; and that the unit clarification procedure was a permissible means to include them within the existing unit. The company requested review of the Regional Director's findings and the Board on review found that the analysts were "an accretion" to the certified unit, and rejected all of the company's other contentions. 173 N.L.R.B. No. 43 (1968).
 
 
 6
 When the union shortly thereafter requested recognition and bargaining, the company refused. An unfair labor practice charge was filed with the Board, and in defense the company challenged the Regional Director's conclusion that the Systems and Procedures Analysts should be included in the bargaining unit. It maintained that the Analysts are professional employees within section 2(12) of the National Labor Relations Act, 29 U.S.C. § 152, and that they are confidential employees. The company further took the position that it had no duty to bargain with the union because the unit clarification procedure which was followed was inappropriate and an election should have been held. Without de novo consideration of the unit clarification record, the Board found that the company had failed to bargain with the union in contravention of 8(a) (1) and 8(a) (5) of the Act, and it entered a bargaining order.
 
 
 7
 When the company filed a petition for review in this Court, the Board was allowed to withdraw the certified list so that it could review the decision of the Regional Director in the underlying unit clarification proceeding in conformity with Pepsi-Cola Bottling Co. v. N.L.R.B., 409 F.2d 676 (2d Cir. 1969), cert. denied, 396 U.S. 904, 90 S.Ct. 219, 24 L. Ed.2d 181 (1969). The Board itself upheld the findings of the Regional Director. 182 N.L.R.B. No. 5 (1970).
 
 
 8
 Petitioner argues that the Regional Director and the Board erred in finding that the Analysts are technical employees. Petitioner contends that they are professional employees within section 2(12) of the Act and, as a result, the N.L.R.B. could not add them to the existing unit without holding an election. According to the company, the present Analyst positions are an outgrowth of the 1956 staff assistant position (a professional position outside of the certified bargaining unit) and like the staff assistant, the Analysts are professionals because they use independent judgment to determine the adaptability of the electronic data processing and computer equipment to new and changed systems. Petitioner also makes much of the fact that the 1965 job description listed a college degree as a prerequisite for the Analyst positions.
 
 
 9
 Section 2(12) of the Act precludes adding professional employees to a unit of non-professionals without affording them the opportunity to express their desires through the electoral process. It defines the professional employee as one whose work is "predominantly intellectual in character" and whose training is normally a result of "specialized intellectual instruction." The Board considers such factors as the possession of a certain measure of skill, knowledge, and independent exercise of judgment in determining whether workers are technical or professional employees. Radio Corporation of America, 141 N.L.R.B. 1134-1137 (1963); Westinghouse Electric Corporation, 163 N.L.R.B. 914, 916 (1967).
 
 
 10
 In support of the Regional Director's finding that the Analysts are technical rather than professional employees, the Board points out that although the Analysts do exercise some independence of judgment, their function is much narrower than that of professional employees such as the staff assistant and their range of discretion is not so broad. It was the staff assistant who considered all of the alternative systems for performing the clerical work and made the affirmative recommendation to adopt the mechanization process. The Analyst merely applies that process to particular assigned projects and formulates systems and procedures in order to solve efficiency problems which are posed to him by others. His concern is with the methods of mechanization rather than the desirability of the process and although his position would never have come into being without the recommendation of the staff assistant, his responsibilities are much more clearly defined than those of the staff assistant.
 
 
 11
 Furthermore, it is apparent that in Westinghouse's operations, the Systems and Procedures Analysts do not need the kind of knowledge of an advanced type that is normally acquired as a result of prolonged study in an institution of higher learning. Thus, despite the fact that the company's 1965 job descriptions for Analyst positions listed a college degree as a prerequisite, only two out of the seven Analysts have college degrees. In the Western Electric Company case, 126 N.L.R.B. 1346, 1349 (1960), the Board, in analyzing the criteria for professional employees, stated that the educational requirements for particular jobs are very important but "if few in the group possess the appropriate degree, it logically follows that the educational characteristics of the work are not those requiring the utilization of advance knowledge."
 
 
 12
 Four of the seven employees now serving as Systems and Procedures Analysts were promoted to the Analyst positions directly from jobs in the existing bargaining unit. While an employee can change his work status as a result of additional training and experience, there would seem to be no basis for finding that these four formerly technical employees had become professionals overnight merely by moving into jobs outside of the existing unit of non-professional employees. The work of the Analysts is not predominately intellectual in character and, as has been indicated, their responsibilities are clearly and narrowly defined. Moreover, the Board has held in other cases that employees who have responsibilities which are substantially similar to those of the Analysts are technical rather than professional employees.[1] We therefore agree with the Board that the Systems and Procedures Analysts are technical rather than professional employees and that section 2(12) of the N.L.R.A. does not require the holding of an election before including them in the existing bargaining unit.
 
 
 13
 The company takes the position that even if the Board was correct in its finding that the Analysts are technical rather than professional employees, the Board still had no authority to include them within the existing bargaining unit because the union's petition for unit clarification raised no question of representation under the Act.[2] According to Westinghouse, the Board can add employees to an existing bargaining unit only when a question of representation has been raised.
 
 
 14
 We hold that even though no question of representation was raised by the petition for unit clarification, the Board did have the power to add the Analysts to the existing unit because the record shows that the Analysts and the employees already represented by the unit shared a community of interests, and the Board could have reasonably concluded that including them in the existing unit would contribute to stability in bargaining. Due to its expertise, the Board has been given wide discretion in determining the appropriate bargaining unit. N.L.R.B. v. Food Employers Council, Inc. and Retail Clerks Union, 399 F. 2d 501 (9th Cir. 1968). The Board's authority to define the appropriate bargaining unit is sufficiently broad to enable it to include new employees in an existing unit without holding an election when the requisite community of interests is present, and inclusion would result in a more efficient collective bargaining relationship. Carey v. Westinghouse Electric Corporation, 375 U.S. 261, 268-269, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).[3]
 
 
 15
 Here the Regional Director and the Board were justified in finding the requisite community of interests between the seven Systems and Procedures Analysts and the employees in the already existing unit. The Analysts and other employees have comparable earnings, and the Analysts work the same hours as the company's first shift. The Analysts and the others receive the same fringe benefits (vacation time, hospitalization, and sick leave). The only significant differences are that the Analysts do not punch a time clock, have different immediate supervisors, and receive only straight time rates for overtime work. Furthermore, the Board could have reasonably concluded that including these seven employees in the existing two hundred and eighty man unit would contribute to a more efficient and stable bargaining relationship between Westinghouse and its employees. We therefore conclude that the record fully supports the Board and the Regional Director in adding these employees to the existing unit without an election.
 
 
 16
 At the same time we feel that there is some merit to the company's contention that the right of free choice for the new employees should be one of the important considerations for the Board in determining the means to redefine the scope of the appropriate bargaining unit. As a general rule, the accretion doctrine should be applied restrictively since it deprives the new employees of the opportunity to express their desires regarding membership in the existing unit. N.L.R.B. v. Masters Lake Success, Inc., 287 F.2d 35-36 (2d Cir. 1961); N.L.R.B. v. Adhesive Products Corp., 281 F.2d 89, 91 (2d Cir. 1960). And when the relevant considerations are not free from doubt, it would seem more satisfactory to resolve such close questions through the election process rather than seeking an addition of the new employees by a finding of accretion. N.L.R.B. v. Food Employers Council, Inc. and Retail Clerks Union, Local 770, 399 F.2d 501, 502 (9th Cir. 1968); International Union, etc. v. N.L. R.B., 231 F.2d 237, 243 (7th Cir. 1956), cert. denied, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117.
 
 
 17
 The company further argues that the union waived the right to bargain on behalf of the Analysts because the union was dilatory in claiming representation rights through the unit clarification petition for classifications which arose after the union's certification. Petitioner points out that since 1961 the IUE had no less than two national and two local negotiations with the opportunity to bargain for the Analysts and failed to do so. The Board answers that the failure to claim these classifications at an earlier date is not fatal to the union's right now to invoke the clarification procedure because the company withheld information regarding the Analysts job description and, as a result, made it impossible for the union to determine whether the Analysts should be within the existing unit. We agree.
 
 
 18
 In 1965 the union first sought information regarding six named employees who had formerly been classified as "Programmers" and were at about that time reclassified as "Analysts," which is their present job title. The request for information was made on June 4, 1965. On July 13, 1965, the union complained that it had received no reply to its request and when the company finally did answer by letter dated December 2, 1965, it said only that the employees were classified as Systems and Procedures Analysts "A" or "B" and that "the specific language of certification excludes `professional employees.'"
 
 
 19
 As the Regional Director indicated on the record, the company gave the union too little information to have enabled the union to assess the validity of the company's assertion that the Analysts were professional employees and excluded from the unit on that ground. Between the time of the company's vague reply of December 2, 1965 and the filing of the union's petition for unit clarification in 1967, there was only the October 1966 national collective bargaining agreement and its local supplement. Given these facts, the record as a whole supports the conclusion of the Board and the Regional Director that the union had not "slept on its rights" so as to preclude it from raising the unit clarification issue through a petition for clarification in 1967. We find that the company's other arguments are without merit.
 
 
 20
 Enforcement is granted.
 
 
 
 Notes:
 
 
 [1]
 "Engineering data processors" are technical employees. Radio Corporation of America, 141 N.L.R.B. 1134, 1136-7 (1963). "Programmers" are technical. R. L. Polk & Co., 123 N.L.R.B. 1171, 1172-1173 (1959). "Instrument systems analysts" are technical employees. Westinghouse Electric Corporation, 163 N.L. R.B. 914-916 (1967)
 
 
 [2]
 At one point in its argument the company takes an entirely different approach to this question — it contends that the union's petition for clarification does raise a question of representation and, for this reason, that an election is required. Since we agree with the finding of the Regional Director and the Board that no question of representation was raised by the clarification petition, we do not address ourselves to the scope of the Board's authority to clarify a bargaining unit when it is faced with a question of representation
 
 
 [3]
 The process through which the Board has added new employees to an existing group without holding an election has often been called "an accretion." When the new employees are added to and comingled with existing employees as to lose their separate identity, their inclusion in the existing bargaining unit follows as a matter of course. "When such inclusion is permitted, on the basis of criteria developed by the Board and approved by the courts * * * the new group is [called] an `accretion' to the old group." N. L. R. B. v. Food Employers Council, Inc., 399 F.2d 502-503 (9th Cir. 1968); also N. L. R. B. v. Sunset House et al., 415 F.2d 545, 547 (9th Cir. 1969)
 
 
 MOORE, Circuit Judge (concurring):
 
 21
 I concur in the opinion of the Court.
 
 
 22
 The National Labor Relations Act, § 9(b) (1), 29 U.S.C. § 159(b) (1) prohibits the adding of professional employees to a nonprofessional unit without an election. The relevant inquiry therefore involves an examination of whether the definition of the term "professional" is met. A "professional" is defined in § 2 (12) of the National Labor Relations Act, 29 U.S.C. § 152 as:
 
 
 23
 "any employee engaged in work (i) predominately intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes * * *."
 
 
 24
 I agree fully with the following statement of the Court relating to the accretion doctrine:
 
 
 25
 "As a general rule, the accretion doctrine should be applied restrictively since it deprives the new employees of the opportunity to express their desires regarding membership in the existing unit [citations omitted]. And when the relevant considerations are not free from doubt it would seem more satisfactory to resolve such close question through the election process rather than seeking an addition of new employees by a finding of accretion."
 
 
 26
 Applying the standard of § 2(12), I am not "free from doubt" that the Systems and Procedures Analysts A and B (Analysts) meet that part of the definition of "professional" which requires that the work involved must be such that it requires "knowledge of an advanced type * * * customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning." On the facts of this particular case, only two of the seven persons currently employed as Analysts have college degrees and four of the Analysts were promoted to Analyst positions directly from existing bargaining units. Thus, in this case there was a substantial basis for the Board's finding of accretion.
 
 
 27
 However, in the future, persons employed in jobs of this type may well meet the requirements of the statutory definition of "professional." The decision of the Acting Regional Director in this case recognized the "predominately intellectual and varied * * * character" of the Systems Analysts' work. As systems become more complex, so does the job of the Analyst. The devising and revising of systems begin to involve more and more management type decisions in that the nature of a system may determine not only what utilization is to be made of computer and data processing equipment but also what utilization is to be made of a wide variety of employees throughout the plant, the nature of whose job is sufficiently related to the system in question. Accordingly, it is to be expected that Analysts of the future will require greater educational attainment than that possessed by the Analysts here involved. As educational patterns change and scientific and technical courses are available in two-year colleges or similar educational institutions giving intensive and concentrated training in this field, such Analysts, in my opinion, would clearly not be precluded from being treated as professionals merely because they had not elected to follow the more stereotyped four-year course.
 
 
 28
 Therefore, although I wholly subscribe to the Court's opinion on the facts here presented, I would construe the word "professional" with the greatest liberality in deciding this status and would give to such an employee the broadest rights to decide whether or not he might wish to be a union member or remain outside the fold.